UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

FEDERICO CHEVEREZ, JR.,

                      Plaintiff,

        v.

COMMISSIONER OF SOCIAL SECURITY,

                      Defendant.
_____

DECISION & ORDER

18-CV-0711MWP

## PRELIMINARY STATEMENT

       Plaintiff Federico Cheverez, Jr. ("Cheverez") brings this action pursuant to Section 205(g) of the Social Security Act , 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for Supplemental Security Income Benefits and Disability Insurance Benefits ("SSI/DIB"). Pursuant to the Standing Order of the United States District Court for the Western District of New York regarding Social Security cases dated June 1, 2018, this case has been assigned to, and the parties have consented to the disposition of this case by, the undersigned. (Docket # 15).

       Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 11, 13). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Cheverez's motion for judgment on the pleadings is denied.

**DISCUSSION**

**I.      Standard of Review**

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted). Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

(1) whether the claimant is currently engaged in substantial gainful activity;

(2) if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3) if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(4) if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity [("RFC")] to perform his or her past work; and

(5) if not, whether the claimant retains the [RFC] to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467. "The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

3

step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

## II.     Cheverez's Contentions

In his prolix memorandum,[1] Cheverez contends that the ALJ's determination that he is not disabled is not supported by substantial evidence. (Docket ## 11-1, 14). Although the precise challenges pressed by Cheverez are sometimes difficult to identify, the thrust of his argument is that the ALJ's RFC assessment is not based upon substantial evidence because he improperly weighed the medical opinion evidence of record. (Docket ## 11-1 at 18-26; 14 at 1-6). According to Cheverez, the ALJ failed to provide good reasons for discounting the medical opinions of his treating physicians, Martha Roden ("Roden"), MD, and Parin Naik ("Naik"), MD. (*Id.*). Further, Cheverez contends that the ALJ improperly relied upon stale opinions authored by state consulting physicians, Thomas McLaughlin ("McLaughlin"), MD, and Candelaria Legaspi ("Legaspi"), MD. (*Id.*). Finally, Cheverez maintains that the ALJ's RFC fails to account adequately for limitations caused by his mental health impairments because the ALJ improperly discounted the "mental findings" of Roden and Cheverez's psychiatrist, Jeffrey Kashin ("Kashin"), MD. (Docket ## 11-1 at 26-30; 14 at 7-8).

---

[1] The Local Rules of Civil Procedure for the Western District of New York impose a thirty-page limit on opening briefs in Social Security cases and require briefs to be double-spaced, although footnotes may be single-spaced. W.D.N.Y. L. R. 5.5(d)(4); 10(a)(2). Cheverez's initial brief is exactly thirty pages, but contains twenty-nine, single-spaced footnotes, many of which span half of a page in length. (Docket # 11-1). Although the irony of addressing the overuse of footnotes in a footnote is apparent, Cheverez's use of footnotes here contravenes the local rules. *See* W.D.N.Y. L. R. 10(a)(3) ("extensive footnotes . . . may not be used to circumvent page limitations"); *Varda, Inc. v. Ins. Co. of N. Am.*, 45 F.3d 634, 640 (2d Cir. 1995) (litigant "brazenly used textual footnotes to evade page limits") (internal quotations omitted); *see also Alix v. McKinsey & Co.,*, 404 F. Supp. 3d 827, 832 n.3 (S.D.N.Y. 2019) (party's excessive use of footnotes was "an unacceptable abuse of the briefing limitations set by the [c]ourt"). Counsel is cautioned to comply with the Local Rules in future briefs.

**III.   Analysis**

An individual's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting on a continuing basis." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (1996)).  In making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370 F. App'x 231 (2d Cir. 2010).

An ALJ should consider "all medical opinions received regarding the claimant." *See Spielberg v. Barnhart*, 367 F. Supp. 2d 276, 281 (E.D.N.Y. 2005) (citing 20 C.F.R. § 404.1527(d)[2]).  Generally, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019) ("[t]he opinion of a claimant's treating physician as to the nature and severity of an impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record") (internal quotations and brackets omitted).  Thus, "[t]he opinion of a treating physician is

---

[2] This regulation applies to claims filed before March 27, 2017.  For claims filed on or after March 27, 2017, the rules in 20 C.F.R. § 404.1520c apply.

5

generally given greater weight than that of a consulting physician[] because the treating physician has observed the patient over a longer period of time and is able to give a more detailed picture of the claimant's medical history." *Salisbury v. Astrue*, 2008 WL 5110992, *4 (W.D.N.Y. 2008).

"An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must explicitly consider the "*Burgess* factors":

> (1) the frequency of examination and length, nature, and extent of the treatment relationship,
>
> (2) the amount of medical evidence supporting the opinion,
>
> (3) the consistency of the opinion with the record as a whole,
>
> (4) whether the opinion is from a specialist, and
>
> (5) whatever other factors tend to support or contradict the opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010); *see also Estrella v. Berryhill*, 925 F.3d at 95-96 ("[f]irst, the ALJ must decide whether the opinion is entitled to controlling weight[;] . . . if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it[;] [i]n doing so, it must 'explicitly consider' the . . . nonexclusive '*Burgess* factors'"). "At both steps, the ALJ must 'give good reasons in its notice of determination or decision for the weight it gives the treating source's medical opinion.'" *Estrella*, 925 F.3d at 96 (quoting *Halloran v. Barnhart*, 362 F.3d at 32); *Burgess v. Astrue*, 537 F.3d 117, 129-30 (2d Cir. 2008) ("[a]fter considering the above factors, the ALJ must comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion[;] . . . [f]ailure to provide such 'good reasons' for not crediting the opinion of a

6

claimant's treating physician is a ground for remand") (citations and quotations omitted); *Wilson v. Colvin*, 213 F. Supp. 3d 478, 482-83 (W.D.N.Y. 2016) ("an ALJ's failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight given denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record") (alterations, citations, and quotations omitted). "This requirement allows courts to properly review ALJs' decisions and provides information to claimants regarding the disposition of their cases, especially when the dispositions are unfavorable." *Ashley v. Comm'r of Soc. Sec.*, 2014 WL 7409594, *1 (N.D.N.Y. 2014) (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

I first address Cheverez's challenge to the ALJ's evaluation of the opinions submitted by Naik and Roden concerning Cheverez's physical capabilities. Treatment records suggest that Cheverez may have begun treatment with Naik in March 2015, although the only treatment note in the record documents a visit on June 26, 2015. (Tr. 515-58). Naik completed a medical source statement of Cheverez's ability to do work-related activities a few days later, on July 1, 2015. (Tr. 559-64). Naik opined that Cheverez was able to lift and carry up to ten pounds occasionally, and could reach, handle, finger, feel, push and pull occasionally. (*Id.*). According to Naik, degenerative changes of Cheverez's cervical spine, as well as disc herniations, limited his ability to lift and work with his hands. (*Id.*). Naik also opined with respect to Cheverez's abilities to sit, stand, and walk "[a]t [o]ne [t]ime without [i]nterruption" and indicated that Cheverez could sit for one hour, stand for thirty to forty-five minutes, and walk for fifteen to twenty minutes at a time. (*Id.*). He further assessed those abilities in "[t]otal in an 8 hour work day" and indicated that Cheverez had the same limitations over the entirety of an eight-hour workday. (*Id.*). According to Naik, Cheverez had limited functioning in his back

7

and lower extremities that prohibited him from engaging in prolonged sitting, standing and walking. (*Id.*). Naik further indicated that Cheverez would need the freedom to adjust positions or lie down in order to alleviate pain. (*Id.*). Naik further opined that Cheverez could occasionally operate foot controls, climb stairs and ramps, and balance, but could never climb ladders or scaffolds, stoop, kneel, crouch, or crawl. (*Id.*). Finally, Naik indicated that Cheverez generally could engage in daily activities, including shopping, using public transportation, preparing simple meals, caring for personal hygiene, and sorting and handling files, but that pain and muscle spasms could affect his ability to engage in such activities during periods of symptomatic "flare[] ups." (*Id.*).

Roden completed a medical source statement relating to Cheverez on December 13, 2016. (Tr. 608-12). She indicated that she had treated Cheverez during five appointments and that he suffered from morbid obesity, osteoarthritis of the bilateral knees, back pain, bipolar disorder, sleep apnea, and elevated TSH and lipids. (*Id.*). According to Roden, Cheverez's symptoms included chronic back and knee pain, anxiety and depression, and he experienced severe pain with standing, walking and using stairs. (*Id.*). Based upon information received from Cheverez's psychiatrist, Roden indicated that he suffered from psychological conditions, including bipolar disorder and post-traumatic stress disorder ("PTSD"). (*Id.*). Roden declined to comment on whether Cheverez was capable of handling work-related stress, noting that she was not his treating psychiatrist and that he was conversational and appropriate during appointments. (*Id.*). According to Roden, she was unable to assess whether pain or other symptoms would interfere with Cheverez's attention and concentration, suggesting that such an assessment would depend upon the physical requirements of his job. (*Id.*). With the exception of opining that Cheverez was able to walk two to three blocks without rest, Roden provided no other opinions

about Cheverez's ability to perform physical work-related functions, including sitting, standing, walking, lifting, and engaging in postural movements. (*Id.*).

In his decision, the ALJ concluded that Cheverez retained the RFC to perform sedentary work, except that he could sit for one hour, stand for thirty to forty-five minutes, and walk for fifteen to twenty minutes at a time, lift, carry, push and pull ten pounds only occasionally and less than ten pounds frequently, and only occasionally operate foot and hand controls, reach, handle and finger, climb ramps and stairs, and never climb ropes, ladders or scaffolds, or balance, stoop, kneel, crouch or crawl.[3] (Tr. 17). In reaching this conclusion, the ALJ gave "great weight" to Roden's opinion that Cheverez retained the ability to walk two to three blocks at a time and assigned "little weight" to Naik's opinion, concluding that his opinion that Cheverez could only sit for a total of one hour, stand for a total of thirty to forty-five minutes, and walk for a total of fifteen to twenty minutes during an eight-hour workday was not supported by Naik's treatment notes, examination findings, or the medical evidence of record. (Tr. 27). Cheverez contends that the ALJ improperly failed to adopt the more limiting restrictions of Roden's and Naik's opinions without providing good reasons for doing so. I disagree.

As an initial matter, Roden indicated that she was generally unable to provide a functional assessment of Cheverez's ability to perform work-related functions beyond identifying his diagnosed medical conditions and some of his symptoms and opining that he could walk up to three blocks without rest. Rather, she indicated that she would need to conduct a functional assessment evaluation in order to opine on Cheverez's physical capabilities and that she was not the appropriate medical source to opine on limitations caused by his mental

---

[3] The ALJ also assessed various environmental limitations not relevant to this decision. (Tr. 17).

impairments. (Tr. 608-12). Cheverez nonetheless maintains that Roden did assess significant limitations in his ability to work without being off-task or requiring substantial rest periods. (Docket # 11-1 at 20-22) (interpreting Roden's opinion as indicating that Cheverez would "need rest periods due to severe pain" and would be "off-task" or have periods of "missed work").

Cheverez mischaracterizes Roden's opinion. In responding to specific questions about Cheverez's sitting, standing, and walking capabilities, his need to rest and to alternate positions, and his expected frequency of absences from work, Roden stated that she was unable to provide an opinion without conducting an evaluation of Cheverez. (Tr. 608-12). Indeed, the only functional assessment she provided – that Cheverez could walk three blocks without rest – was given great weight and accounted for by the ALJ in his RFC. (Tr. 27). On these facts, the ALJ did not err in his evaluation of Roden's assessment.

I turn next to Cheverez's challenge to the ALJ's determination to give "little weight" to Naik's opinion, finding that it was not supported by Naik's treatment notes or the other evidence contained in the record. (Docket ## 11-1 at 21-23; 14 at 3-5). Cheverez contends that the ALJ failed to provide sufficient reasons for discounting the opinion because it came from a treating source. (*Id.*). He further maintains that this error was harmful because the ALJ's RFC failed to account for several restrictive limitations identified by Naik, including lifting, sitting, standing, walking, attention and attendance limitations. (*Id.*).

Cheverez misconstrues Naik's opinion to indicate that he would require "rest periods" or would be "off-task" or absent from work. (Docket # 11-1 at 21 ("[t]he 2015 opinion from Dr. Naik . . . indicate[s] [Cheverez] would need rest periods due to severe pain[,] . . . [which] suggests off-task limitations or missed work periods")). Naik's opinion suggested that Cheverez would need to adjust positions throughout the workday and might experience

10

"flare-ups." (Tr. 559-64). Nowhere did Naik opine that Cheverez would be off-task or absent from work or would require extra breaks. (*Id.*). Cheverez's challenge, insofar as it rests upon this interpretation of Naik's opinion, is not supported by the record.

Even assuming that Naik qualifies as a treating physician whose opinion is entitled to controlling weight,[4] I disagree that the ALJ erred in evaluating the opinion. Although the ALJ professed to give the opinion "little weight," a review of his decision reveals that he in fact adopted much of Naik's opinion. (*Compare* Tr. 17 *with* Tr. 559-64). The ALJ concluded that Cheverez retained the ability to perform sedentary work, but with other significant limitations virtually identical to the limitations assessed by Naik. (*Id.*).

Indeed, the only limitation assessed by Naik that was rejected by the ALJ[5] was the assessment that over the course of an eight-hour workday Cheverez could sit for no more than one hour, stand for no more than forty-five minutes, and walk for no more than twenty minutes.[6]

---

[4] Whether Naik, who had one documented treatment appointment with Cheverez, should properly be considered a treating physician is hardly free from doubt. *See Wearen v. Colvin*, 2015 WL 1038236, *14 (W.D.N.Y. 2015) ("I disagree with [claimant's] characterization of [the doctor] as a treating doctor because the record reflects that [the doctor] only treated [claimant] on one occasion before rendering her opinion") (citing *Hamilton v. Astrue*, 2013 WL 5474210, *11 (W.D.N.Y. 2013) ("it is not clear that [the doctor] may be considered a treating physician because [claimant] testified that the first time she was examined by [the doctor] was when he completed her disability paperwork") (collecting cases)).

[5] Cheverez suggests that the lifting restrictions assessed by Naik were more restrictive than those assessed by the ALJ. (Docket # 11-1 at 21). I disagree. In his decision, the ALJ adopted Naik's opinion that Cheverez could only occasionally lift objects weighing ten pounds. (Tr. 17, 559). The ALJ also concluded that Cheverez could frequently lift objects less than ten pounds – a determination that is not necessarily inconsistent with Naik's opinion. In any event, even assuming that Naik assessed more restrictive lifting limitations, I conclude that the ALJ's RFC determination is supported by substantial evidence, including evidence relating to Cheverez's professed activities of daily living, which, among other things, involved lifting his one-year-old daughter from time to time. (Tr. 515). The ALJ's restrictions are also consistent with Cheverez's own statements in his function report that he could lift and carry up to ten pounds and his testimony that his doctors had advised him he should not carry in excess of ten pounds. (Tr. 55-56, 259).

[6] Naik's medical source statement indicates that Cheverez could sit, stand or walk no longer in an entire eight-hour workday than he could at any single time. *See Gray v. Colvin*, 2015 WL 5005755, *5 (W.D.N.Y. 2015) ("[t]he ALJ rejected the portion [of the treating physician's] opinion which found significant standing and walking restrictions, stating that these opinions were 'incredulous and not supported by the physician's own treatment records,' finding that these extreme limitations 'suggested that [the doctor] likely did not read or complete that portion of the questionnaire carefully'"). Although it is possible that Naik made a mistake in completing the

11

By limiting Cheverez to sedentary work, the ALJ necessarily determined that he was able to sit for up to six hours and stand or walk up to two hours in total during a workday. *See Murray v. Colvin*, 2016 WL 5335545, *10 (W.D.N.Y. 2016) ("sedentary work requires the ability to lift up to ten pounds at a time, to lift and carry light objects occasionally, to stand and walk up to two hours per workday, and to sit for up to six hours of an eight-hour workday").

In his decision, the ALJ carefully reviewed and discussed in detail Cheverez's medical records, including his emergency room visits, physical therapy appointments, and treatment with various providers, including Naik and Roden, as well as Cheverez's own statements concerning his symptoms and limitations. (Tr. 18-27). The ALJ adopted the majority of the limitations assessed by Naik, but found his total workday sitting, standing and walking limitations inconsistent with his treatment notes and the record as a whole. (Tr. 27). The restrictive total workday limitations, which would essentially restrict Cheverez to a supine or prone position for approximately six hours of an eight-hour workday, were properly rejected by the ALJ as unsupported by the medical evidence and the record as a whole.

Although the ALJ's opinion does not explicitly identify the specific information that he found to be inconsistent with Naik's assessed limitations, his decision as a whole reveals the basis of his determination. *See Gladney v. Astrue*, 2014 WL 3557997, *14 (W.D.N.Y. 2014) (ALJ's failure to articulate clearly the basis for his determination was harmless where it was "possible to glean the ALJ's rationale" from a review of the entire decision). The ALJ recounted at length those portions of the medical record demonstrating that Cheverez generally received sporadic and conservative treatment for his back and knee impairments and engaged in activities

---

questionnaire, I assume, for purposes of this decision, that Naik meant to assess such severe workday sitting, standing and walking limitations.

of daily living that were inconsistent with the extreme sitting, standing and walking limitations assessed by Naik. (Tr. 19-27).

As the ALJ noted, Cheverez was injured in a bus accident in 2009, at which time an MRI of his spine demonstrated mild diffuse degenerative disc disease and a tiny protrusion. (Tr. 19). Twice in 2014, Cheverez visited the emergency room for back-related complaints. (Tr. 20-21 (citing Tr. 362-81)). State examiner McLaughlin examined Cheverez in October 2014 and assessed a negative straight leg raise, normal range of motion in his knees and cervical and lumbar spine, and no evidence of joint deformity or weakness in his extremities. (Tr. 21 (citing Tr. 413-18)). Cheverez returned to the emergency room in February 2015 for complaints relating to his knee and back. (Tr. 22 (citing Tr. 501-05)). He attended a few physical therapy sessions in March 2015 and consulted with Naik in June 2015 for complaints related to those physical ailments. (Tr. 22-23 (citing Tr. 508, 515-16)).

It was not until April 2016 that Cheverez began regular treatment with Roden for his impairments. (Tr. 23 (citing Tr. 569)). In the summer of 2016, Cheverez was evaluated by an orthopedic doctor and a pain management specialist. (Tr. 24-27 (citing Tr. 594-95, 601-02, 604-05, 649-63)). Those physicians prescribed back and knee injections, administered manipulations and stretches for Cheverez's back and legs, and provided instructions for home exercises. (*Id.*). As the ALJ recognized, the treatment that Cheverez received significantly decreased his pain symptoms. (Tr. 27). Cheverez reported that he was able to independently perform activities of daily living, drive for up to thirty minutes at a time, and walk and exercise in an effort to lose weight. (Tr. 25-26 (citing Tr. 604-05, 649)).

In other words, the ALJ acknowledged that the medical record established that Cheverez suffered from ongoing and painful back and knee impairments that limited his ability

13

to perform work-related functions. Indeed, the ALJ adopted the majority of the limitations assessed by Naik, with the exception of total workday sitting, standing and walking limitations. I conclude that the ALJ's rejection of those limitations is supported by substantial evidence in the record and is adequately explained by his decision. *See Roma v. Astrue*, 468 F. App'x 16, 19-20 (2d Cir. 2012) (ALJ properly applied treating physician rule where "ALJ accepted the vast majority" of the physician's conclusions but concluded that substantial evidence did not support physician's conclusion that the claimant's social limitations rendered him disabled); *Burkey v. Colvin*, 284 F. Supp. 3d 420, 425 (W.D.N.Y. 2018) ("[w]hile the ALJ's explanation for her findings was not a model of clarity, this is not a case where the [c]ourt is 'unable to fathom the ALJ's rationale,' and I find that to the extent that the ALJ did not credit every single aspect of [the consulting physician's] opinions, the rejected portions were not supported by the medical evidence of record, and her decision rejecting them did not lack substantial evidence"); *Gray v. Colvin*, 2015 WL 5005755 at *5 (ALJ properly rejected portion of treating physician's opinion assessing extreme standing and walking restrictions on grounds they were not supported by substantial record evidence; "[t]he ALJ was within his discretion to accept certain portions of [the doctor's] opinion, but reject those that were not supported by her own treatment notes or other substantial record evidence"); *Durante v. Colvin*, 2014 WL 4843684, *4 (D. Conn. 2014) (ALJ acted within appropriate discretion to adopt majority of limitations assessed by treating physician but to reject limitation regarding number of daily breaks; "[a]lthough more explicit reasoning would undoubtedly have been preferable to the terseness of this portion of the ALJ's decision, on this record the court concludes that this part of the ALJ's [d]ecision was adequately supported by substantial evidence and not contrary to law").

I also reject Cheverez's contention that the ALJ erred by relying upon opinions of state consulting physicians McLaughlin and Legaspi. (Docket # 11-1 at 23-26). According to Cheverez, McLaughlin's opinion was internally inconsistent, and both opinions were stale because they did not consider subsequent imaging and injuries. (*Id.*). Although the ALJ indicated that he gave "great weight" to McLaughlin's opinion and "some weight" to Legaspi's opinion, the ALJ essentially adopted the limitations assessed by Naik. Indeed, the limitations assessed by McLaughlin and Legaspi were generally less restrictive than those assessed by Naik and ultimately adopted by the ALJ – particularly with respect to lifting, carrying, sitting, standing, and walking. (*Compare* Tr. 17 *with* Tr. 97-100, 419-24 and 559-64). For that reason, I need not determine whether the ALJ erred in weighing the consultative opinions.

I turn now to Cheverez's contention that the ALJ impermissibly discounted Roden's and Kashin's opinions regarding mental limitations. (Docket ## 11-1 at 26-30; 14 at 7-8). The ALJ found that although Cheverez suffered from medically determinable mental impairments, including anxiety disorder and depressive disorder, those impairments were not severe because they did not "cause more than minimal limitation in [Cheverez's] ability to perform basic mental work activities." (Tr. 16). Cheverez maintains that the ALJ improperly "diminished the mental findings of [Roden and Kashin]" and improperly elevated "his own lay opinion over [Cheverez's] treating doctors." (Docket # 11-1 at 26-27). I disagree.

The ALJ proceeded through the sequential evaluation and considered Cheverez's mental health impairments throughout the remainder of his analysis, but ultimately did not assess any work-related limitations stemming from those impairments. (Tr. 16-28). In reaching this conclusion, the ALJ summarized the sparse record evidence concerning Cheverez's mental health treatment. According to the ALJ, Naik's treatment notes indicated that Cheverez was

15

taking medication to address depression. (Tr. 22). Roden's treatment notes from April 2016 indicated that Cheverez screened negative for depression, but a follow-up screen the next month was positive. (Tr. 23-24 (citing Tr. 573, 578, 581)). At that time, Cheverez reported that he had not taken his depression medication for the previous two weeks because he had been feeling better. (*Id.*). Roden referred Cheverez for mental health treatment (*id.*), and Cheverez attended two appointments with Kashin in August and December 2016 (Tr. 25 (citing Tr. 614, 627)). Cheverez's mental status examinations during these visits were essentially normal, and Kashin indicated that he appeared to be stable on his prescribed medications, which were helpful in managing his symptoms. (*Id.*).

Cheverez does not challenge the ALJ's conclusion that his mental health impairments were non-severe.[7] Rather, he contends that the ALJ improperly discounted Cheverez's treating providers' opinion about his mental limitations. Cheverez's argument misconstrues the record; neither Roden nor Kashin assessed that he suffered from any mental work-related limitations. Tellingly, Cheverez himself does not identify any specific limitations resulting from his mental health impairments that were not considered by the ALJ or accounted for in the RFC. (Docket ## 11-1, 14).

Although Cheverez testified about experiencing fatigue, difficulty making decisions, and social isolation, his testimony suggests that those symptoms were likely attributable to physical impairments (which were properly evaluated by the ALJ). For instance, although Cheverez testified that he was often fatigued during the day, he attributed his inability to sleep to his chronic pain. (Tr. 53, 71). Similarly, although Cheverez initially testified that he tended to isolate himself and was unable to go shopping, he subsequently testified that his

---

[7] Indeed, Cheverez did not identify any mental health impairments in his initial application for benefits. (Tr. 236).

inability to go to the store resulted from his physical impairments. (Tr. 63, 70). Indeed, Cheverez's testimony primarily focused on the allegedly debilitating effects of his back and knee pain. (Tr. 41-73, 86-91).

As the ALJ noted, Cheverez received relatively infrequent mental health treatment and generally improved with prescribed medication. The medical record does not suggest that Cheverez suffered from mental health limitations unaccounted for by the ALJ. Further, the job positions identified by the ALJ at step five involve only unskilled work. *See* DOT 379.367-010, 1991 WL 673244 (1991); DOT 237.367-014, 1991 WL 672186 (1991); *Cosme v. Colvin*, 2016 WL 4154280, *13 n.7 (W.D.N.Y. 2016) (citing SSR 00-4P, 2000 WL 1898704, *3 (S.S.A. 2000) ("unskilled work corresponds to an SVP of 1-2")). Nothing in the record suggests that Cheverez is mentally incapable of performing simple work, and neither Roden nor Kashin opined to the contrary.[8] Accordingly, I find that the ALJ did not err in evaluating the evidence submitted by Roden and Kashin.

In sum, I conclude that the ALJ's RFC assessment was supported by substantial evidence. In his decision, the ALJ adopted the limitations assessed by Naik, with the exception of the approximately two-hour total workday sitting, standing and walking limitations. As to those, the record simply does not support the conclusion that Cheverez spends or needs to spend the majority of his day lying down. For example, according to Cheverez's own statements, he was able to search for employment, walk, prepare meals for approximately thirty minutes a day, perform household chores for approximately two-and-a-half hours at a time, grocery shop twice

---

[8] Cheverez's remaining and largely conclusory challenges to the RFC – that the ALJ improperly failed to account for Cheverez's migraines or other "episodic symptoms" (Docket ## 11-1 at 25; 14 at 6), substituted his own lay opinion (Docket ## 11-1 at 25-27; 14 at 7), placed undue emphasis on the nature of Cheverez's treatment or his improvement with treatment (Docket ## 11-1 at 26; 14 at 7), ignored or misconstrued the record (Docket # 14 at 4), failed to consider the combined impact of his impairments or develop the record (Docket ## 11-1 at 28-29; 14 at 6-8), failed to recontact his treating physicians (Docket # 14 at 7-8), and failed to properly evaluate Cheverez's credibility (Docket # 11-1 at 29-30) – are likewise lacking in merit.

a month, carry his one-year-old daughter from time to time, care for his personal hygiene, and drive for approximately thirty minutes. (Tr. 254-63, 515, 649). Further, despite his complaints of debilitating pain, Cheverez received only sporadic treatment for his back and knee pain between 2013 and 2015; when he did begin to receive regular treatment in 2016, that treatment resulted in significant decrease in his pain-related symptoms.

In other words, although the record demonstrates that Cheverez suffers from back and knee impairments that interfere with his ability to engage in prolonged sitting, standing and walking, substantial evidence supports the ALJ's conclusion that Cheverez can sit, walk and stand as required to perform sedentary work, provided that he is able to adjust positions as needed.[9] (Tr. 17-28). Substantial evidence in the record also supports the ALJ's conclusion that Cheverez's non-severe mental impairments improved with treatment and did not interfere with his functioning. Accordingly, I conclude that the ALJ's RFC assessment was reasonable and supported by substantial evidence.

## CONCLUSION

This Court finds that the Commissioner's denial of SSI/DIB was based on substantial evidence and was not erroneous as a matter of law. Accordingly, the ALJ's decision is affirmed. For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 13)** is **GRANTED**. Cheverez's motion for judgment on the pleadings

---

[9] The vocational expert testified that the sedentary positions he identified could be performed in a standing or seated position. (Tr. 83).

**(Docket # 11)** is **DENIED**, and Cheverez's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
February 5, 2020